<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

**NAKEYLA HILLS**,

           Plaintiff,

        v.

**HHC CORPORATION d/b/a**
**MCDONALD'S**,

           Defendant.

Civil Action No. 20-6237 (ZNQ) (RLS)

**OPINION**

---

<u>**QURAISHI, District Judge**</u>

    **THIS MATTER** comes before the Court upon a Motion for Summary Judgment filed by Defendant HHC Corporation ("Defendant"). ("Motion", ECF No. 102.) Defendant filed a Brief in Support of its Motion ("Moving Br.", ECF No. 102-1) and a Statement of Material Facts ("SMF", ECF No. 102-2.) Plaintiff Nakeyla Hills filed a Brief in Opposition to Defendant's Motion ("Opp'n", ECF No. 105) along with her Counter Statement of Material Facts ("CSMF", ECF No. 105-1.) Defendant filed a Reply to Plaintiff's Opposition. ("Reply", ECF No. 106.)

    The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT Defendant's Motion for Summary Judgment with respect to Plaintiff's retaliation claims in Counts Two, Four, and Six, and *Pierce* doctrine claim in Count Seven of the Fourth Amended Complaint. The Court will DENY

Defendant's Motion for Summary Judgment with respect to the remaining claims in the Fourth Amended Complaint.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A.     THE PARTIES

Plaintiff is a former employee who alleges constitutional and state law violations following her discharge from a McDonald's franchise in Howell, New Jersey.  Defendant is a franchisee doing business as McDonald's.

### B.     PROCEDURAL HISTORY

This action commenced on May 21, 2020 when Plaintiff filed her Complaint.  (ECF No. 1.)  Plaintiff subsequently amended her Complaint three times before Defendant and former Defendant filed Motions to Dismiss the Third Amended Complaint.  (ECF Nos. 44, 45.)  On June 29, 2021, the Court granted former-Defendant McDonald's Motion to Dismiss, and granted-in-part and denied-in-part Defendant's Motion to Dismiss.  ("Order", ECF No. 66.)  Specifically, the Court ordered that Plaintiff may proceed on Counts Three (Retaliation in violation of Section 1983), Four (Discrimination in violation of Title VII), and the Law Against Discrimination and *Pierce* claims in Counts Seven, Eight, and Nine are limited to events occurring after May 21, 2018.  Following the Court's Order, Plaintiff submitted a Fourth Amended Complaint on July 19, 2021.  ("Fourth Am. Compl.", ECF No. 74.)  The Fourth Amended Complaint alleges that Plaintiff was consistently harassed and discriminated against at her workplace before being retaliatorily discharged.  (*See generally, id.*)  Defendant filed its answer to the Fourth Amended Complaint on August 9, 2021.  ("Answer", ECF No. 75.)

### C.     UNDISPUTED FACTS

The Court has found the following facts to be relevant and undisputed.

Plaintiff Nakeyla Hills began working at McDonald's in Howell, New Jersey in January 2018, earning $10 an hour. (SMF ¶ 1; CSMF ¶ 1.) In February 2018, Plaintiff spoke with regional manager, Kathy Syzmyczk about assistant manager Swati Cruser making racist comments, and about the store's unsanitary conditions. (*Id.* ¶ 2; *Id.* ¶ 2.) In February 2018, Plaintiff complained to store manager Angelica Orzuna about people calling her names. (*Id.* ¶ 3; *Id.* ¶ 3.) In March 2018, Plaintiff complained to Ms. Orzuna via text message that a co-worker purposely hit her with a bucket and that another co-worker did not change his gloves when dealing with fresh meat. (*Id.* ¶ 4; *Id.* ¶ 4.) A March 9, 2018 letter by assistant manager Justin Egbert stated that Sharon was mopping and pushed the mop bucket into Plaintiff. (*Id.* ¶ 5; *Id.* ¶ 5.) In an undated note, Plaintiff wrote that on March 6, 2018, someone called her a "bitch" because she caught someone stealing. (*Id.* ¶ 6; *Id.* ¶ 6.) In the same undated note, Plaintiff claimed that "Vincent, [another co-worker] grabbing my person" [sic] on April 3, 2018. (*Id.* ¶ 7; *Id.* ¶ 7.) During her deposition, Plaintiff claimed Vincent intentionally touched her breast without her permission. (*Id.* ¶ 8; *Id.* ¶ 8.) An incident report dated April 3, 2018, documented that an employee named Vincent R. spoke to Plaintiff aggressively and that he took a pen off Plaintiff's body without her permission. (*Id.* ¶ 9; *Id.* ¶ 9.) Manager Ms. Cortes acknowledged that Manager Justin Egbert informed her that Plaintiff said Vincent touched her breast. (*Id.* ¶ 10; *Id.* ¶ 10.) Manager Mr. Tommasi stated he did not recall Plaintiff discussing being touched inappropriately by Vincent. (*Id.* ¶ 11; *Id.* ¶ 11.) On April 8, 2018, co-worker Benjamin Horvath called Plaintiff "nigger" and threatened to kill her. (*Id.* ¶ 12; *Id.* ¶ 12.) Plaintiff also claimed that Augustus Horvath called her "nigger" and other derogatory terms "continuously" and testified that she verbally reported this to Managers Justin Egbert, Angelica Orzuna, and Kathy Syzmyczk. (*Id.* ¶ 13; *Id.* ¶ 13.)

Area manager Kathy Syzmyczk testified that she was not aware that Plaintiff alleged that Ben Horvath and Augustus Horvath called Plaintiff a "nigger" but that if she were aware, she would have spoken to the employees about it.  (*Id.* ¶ 14; *Id.* ¶ 14.)  Co-worker Jose Diaz confirmed that Mr. Horvath used to refer to Plaintiff as "nigger," which was also reported to Ms. Orzuna.  (*Id.* ¶¶ 17–18; *Id.* ¶¶ 17–18.)  Ms. Orzuna testified that she did not know what "nigger" meant at the time.  (*Id.* ¶ 19; *Id.* ¶ 19.)  Ms. Orzuna testified no one ever reported to her that Gus called Plaintiff a "bitch."  (*Id.* ¶ 21; *Id.* ¶ 21.)  Mr. Egbert testified that he spoke to Gus about him calling Plaintiff a "bitch" and that he could not use that type of language.  (*Id.* ¶ 22; *Id.* ¶ 22.)  Both Ms. Cortes and Justin Egbert testified that they never heard anyone say "nigger" at McDonald's.  (*Id.* ¶ 24; *Id.* ¶ 24.)  Plaintiff also testified that Ms. Cruser called her a "bitch."  (*Id.* ¶ 26; *Id.* ¶ 26.)  Ms. Syzmyczk testified Ms. Cruser told her that she admitted calling Plaintiff a "bitch", but that it was consensual and that she thereafter counseled Ms. Cruser by stating her conduct was unprofessional and that it should not have occurred.  (*Id.* ¶ 29; *Id.* ¶ 29.)  Plaintiff's shift was thereafter changed from the daytime to the nighttime so that Plaintiff would not have to interact with Ms. Cruser.  (*Id.* ¶ 30; *Id.* ¶ 30.)

Mr. Tommasi testified that he "playfully" called Plaintiff a "bitch" and she responded by stating, "no, call me a boss ass bitch" but further testified that he believed they were "joking around."  (*Id*. ¶ 39; *Id*. ¶ 39.)  Mr. Tommasi testified that he did not recall her making any complaints at the meeting about being called different names or the "n-word."  (*Id*. ¶ 41; *Id*. ¶ 41.)  Mr. Tommassi thereafter apologized to Plaintiff and "tried to settle [their] differences there."  (*Id*. ¶ 42; *Id*. ¶ 42.)  According to Director of Operations Kevin Halligan, Plaintiff accepted Mr. Tommasi's apology.  (*Id*. ¶ 43; *Id*. ¶ 43.)  On July 31, 2018, Plaintiff reported she was kicked by Jessica Colbain but testified that it was "an accident."  (*Id*. ¶ 46; *Id*. ¶ 46.)

On April 30, 2018, Plaintiff informed Ms. Orzuna that she was burned by hot water from a tea machine she cleaned. (*Id.* ¶ 31; *Id.* ¶ 31.) Mr. Egbert testified that Plaintiff "took it upon herself to clean a tea machine [. . . ] And she went to pick it up improperly to clean underneath it and she burned herself picking it up." (*Id.* ¶ 32; *Id.* ¶ 32.) Ms. Orzuna thereafter gave Plaintiff the information she needed to get medical attention for the burn she sustained. (*Id.* ¶ 33; *Id.* ¶ 33.) Plaintiff completed an "Employee Incident Report" and did not write that an employee purposely burned her. (*Id.* ¶ 34; *Id.* ¶ 34.) Plaintiff filed a worker's compensation claim following her injury. (*Id.* ¶ 35; *Id.* ¶ 35.)

In June 2018, Plaintiff spoke to Alondra Cortes and Ms. Orzuna about the condition of the workplace lobby and outside. (*Id.* ¶ 36; *Id.* ¶ 36.) In July 2018, Plaintiff had a meeting with the management team to address her complaints. (*Id.* ¶ 38; *Id.* ¶ 38.) Mr. Halligan testified that he did not receive any complaints regarding the sanitary conditions at the store or the way meat was being handled. (*Id.* ¶ 48; *Id.* ¶ 48.) Ms. Orzuna testified that she did not observe the food being handled in an unsanitary matter in 2018 but recalled that Plaintiff stated Mr. Tommasi did not clean the ice machine properly and generally complained about unsanitary conditions at McDonald's. (*Id.* ¶¶ 49–50; *Id.* ¶¶ 49–50.) Mr. Tommasi testified that he did not recall whether Plaintiff complained about unsanitary conditions but did recall her complaining about him cleaning the ice machine improperly. (*Id.* ¶ 51; *Id.* ¶ 51.) Store owner Daniel Chapman testified that he met with Mr. Halligan and Plaintiff in August 2018 when Plaintiff made general comments that were not helpful enough to understand her concerns. (*Id.* ¶ 52; *Id.* ¶ 52.) Mr. Halligan stated that at the same meeting, Plaintiff made complaints about the general sanitary conditions at McDonald's, but she did not specifically mention food being on the floor or on the walls. (*Id.* ¶ 53; *Id.* ¶ 53.) Eventually, Plaintiff memorialized her complaints in a handwritten document that

noted a staff member was handling food with a "raw hand." (*Id*. ¶¶ 54–55; *Id*. ¶¶ 54–55.)  Mr. Halligan testified that Ms. Syzmyczk followed up and noted there was nothing wrong with the ice machine and that there was nothing going on that should not be going on. (*Id*. ¶ 56; *Id*. ¶ 56.)  Mr. Tommasi testified that the store would become dirty at times but there was no practical way to prevent it during busy times and that if he saw the store was dirty or needed to be cleaned, he would clean it himself or delegate the task. (*Id*. ¶ 57; *Id*. ¶ 57.)  Ms. Orzuna acknowledged that Plaintiff complained about the restaurant being dirty and that she told managers, but there was not enough staff and it was too busy. (*Id*. ¶ 58; *Id*. ¶ 58.)  However, she also testified that when the crew was not busy, they would start working on cleaning jobs like cleaning the fry hopper or grills. (*Id*. ¶ 59; *Id*. ¶ 59.)  Ms. Syzmyczk testified that the restaurant became dirty because of employees and customers, but that she observed staff cleaning up the restaurant during her visits. (*Id*. ¶ 62; *Id*. ¶ 62.)

In July 2018, Plaintiff received a 15-cent raise. (*Id*. ¶ 45; *Id*. ¶ 45.)  Plaintiff stopped reporting to work on September 14, 2018. (*Id*. ¶ 63; *Id*. ¶ 63.)  Plaintiff then filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on June 27, 2019. (*Id*. ¶ 64; *Id*. ¶ 64.)

### A.  Jurisdiction

The Court has jurisdiction based upon Plaintiff's claims under federal law pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

### II.  **LEGAL STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250).

"Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019).  "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue of material fact.'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)).  "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)).

## III.   **DISCUSSION**

In its Motion for Summary Judgment, Defendant seeks judgment as to Plaintiff's Fourth Amended Complaint to Fed. R. Civ. P. 56.  Defendant maintains that it did not violate any statutory, constitutional, or common law concerning Plaintiff's employment, that it addressed Plaintiff's work complaints when she properly informed them, and that it did not terminate her

employment.  (Moving Br. at 8.)  Plaintiff voluntarily stopped reporting to work. As such, Defendant argues that there are no genuine issues of material fact and summary judgment is appropriate.  (*Id.*)

### D.     RACE-BASED DISCRIMINATION CLAIMS

Counts One, Three, and Five allege discrimination by constructive discharge in violation of Section 1981, Title VII, and NJLAD respectively.  Section 1981, Title VII, and NJLAD prohibit discrimination on the basis of race, and claims alleging violations of these statutes are subject to the same legal standard.  42 U.S.C. §§ 1981 *et seq*., 2000e *et seq*.; N.J. Stat. Ann. §§ 10:5-3, 10:5-12(a); *Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, 3 F. Supp. 3d 221, 230 (D.N.J. 2014).  In determining whether discrimination motivated an employment decision, courts consider "direct evidence" or "indirect evidence."  *Wesley*, 3 F. Supp. 3d at 230-31.  The Court will analyze Plaintiff's claims under the three-part burden-shifting framework articulated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) because Plaintiff has not submitted any direct evidence of discrimination.

Under the *McDonnell Douglas* framework, Plaintiff may prove her claim by presenting indirect evidence of discrimination.  *Wesley*, 3 F. Supp. 3d at 231 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).  Plaintiff has the initial burden of establishing a prima facie case to raise an inference of discrimination.  *Id*.  If Plaintiff establishes her prima facie case, the burden shifts to Defendant to demonstrate a "legitimate, nondiscriminatory reason" for the employment decision.  *Id*. (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  If Defendant's burden is met, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that the reason provided by Defendant is pretextual.  *Id*. (citing *Burdine*, 450 U.S. at 260).

"The existence of a prima facie case of race-based employment discrimination 'is a question of law that must be decided by the Court.'" *Id*. at 231–32 (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)).   To establish a prima facie case of unlawful discrimination under § 1981, Title VII, or NJLAD, a plaintiff must demonstrate by a preponderance of the evidence that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) circumstances exist that give rise to an inference of unlawful discrimination.  *Flores v. Danberg*, 706 F. App'x 748, 753 (3d. Cir. 2017); *Tourtellotte v. Eli Lilly & Co*., 636 F. App'x 831, 842 (3d Cir. 2016).  "Moreover, the elements of constructive discharge are the same under Title VII, 42 U.S.C. §§ 1981, and NJLAD." *Behrens v. Rutgers Univ.*, Civ. No. 94-358, 1996 WL 570989, at *4 (D.N.J. Mar. 29, 1996) (citing *Martin v. Citibank, N.A*., 762 F.2d 212, 221 (2d Cir. 1985)).

Defendant argues that Plaintiff failed to establish that Defendant's conduct was the "but-for" cause of her discrimination (Moving Br. at 10), that she suffered an adverse employment action because she willingly quit (*id.*), and that she was subject to pervasive and regular discrimination (*id.*)  Here, Plaintiff points to multiple incidents of racial slurs and derogatory language that were directed towards her while employed by Defendant, which ultimately led to her constructive discharge.

To establish liability for constructive discharge, a plaintiff must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir. 1984).  In adopting this objective standard, the Third Circuit rejected a requirement that "the discrimination complained of amounted to an intentional course of conduct calculated to force the victim's resignation. . . . We hold that no finding of a specific intent on the part of the employer to

bring about a discharge is required for the application of the constructive discharge doctrine." *Id*. at 887–88.  Instead the Third Circuit "adopted a reasonable person test, which is focused on the impact of an employer's actions, whether deliberate or not, upon a 'reasonable' employee." *Levendos v. Stern Entertainment Co*., 860 F.2d 1227, 1230 (3d Cir. 1988).

Although Plaintiff and Defendant disagree on the amount of times Plaintiff was subjected to racial slurs and derogatory name-calling, it is undisputed that Plaintiff was at times called "bitch" and "nigger" (SMF ¶ 17; Cortes Dep., Def. Ex. H, 98:13-15; Pl. Dep. 34:20-35:2) and on at least one occasion Plaintiff reported this harassment and was ignored (Orzuna Dep., Pl. Ex. I, 162:10-14; 175:8-12).  The Third Circuit has recognized that it "cannot state as a broad proposition of law that a single non-trivial incident of discrimination can never be egregious enough to compel a reasonable person to resign." *Levendos*, 860 F.2d at 1232.  Thus, even if Plaintiff only faced discrimination the times on which the parties agreed, it may still rise to the level of constructive discharge.  *Id.*

Clearly the parties disagree as to the number of times Plaintiff faced discrimination.  Based upon its review of the record—resolving all doubt in Plaintiffs' favor, as the Court must in this summary judgment motion—it is possible for a reasonable jury to find that Plaintiff's co-workers' comments and actions in conjunction with the lack of corrective action by Defendant could create intolerable working conditions.  *Behrens,* 1996 WL 570989, at *10.  "Moreover, [Plaintiff] had the additional incentive to resign in order to avoid the stigma associated with termination."  *Id.* While Plaintiff may not have presented an exceptionally strong case of constructive discharge, she has raised sufficient issues of material fact to preclude summary judgment at this time.  *Id.*  The Court will therefore deny the portion of Defendant's motion seeking summary judgment on Counts One, Three, and Five.

### E.   *PIERCE* DOCTRINE PUBLIC POLICY

Count Seven alleges public policy violations under the *Pierce* doctrine.  In *Pierce v. Ortho Pharmaceutical Corp.*, the New Jersey Supreme Court held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy."  84 N.J. 58, 72 (1980).  The sources of public policy include legislation, administrative rules, regulations or decisions, and judicial decisions. *Id.* at 512.  "Absent legislation, the judiciary must define the cause of action in case-by-case determinations."  *Id.*  To sustain this claim, Plaintiff must prove that the protected activity she engaged in was the actual cause of her termination and not for some other reason.  *See House v. Carter-Wallace, Inc.*, 232 N.J. Super. 42, 54 (App. Div. 1989).  "If an employee does not point to a clear expression of public policy, the court can grant a motion to dismiss or for summary judgment." *Cannella v. Conair Corp.*, 2009 WL 4981202, at *3 (App. Div. 2009) (quoting *Pierce*, 84 N.J. at 72).  Additionally, Plaintiff must show that Defendant's conduct actually violated public policy. *Tartaglia v. UBS PaineWebber Inc.*, 197 N.J. 81, 112 (2008).

Plaintiff argues that "Defendant retaliated against Plaintiff for her engagement in protected activities in violation of the New Jersey Constitution and Public Policy by, inter alia, denying her the equal terms and conditions of employment, subjecting her to a hostile work environment and/or wrongfully constructively discharging her."  (Fourth Am. Compl. ¶ 124.)  Defendant argues that Plaintiff failed to establish a violation of the *Pierce* doctrine because "Plaintiff pointed to no specific New Jersey Constitutional provision, legislation, administrative rule, or judicial decision to support her *Pierce* claim."  (Moving Br. at 25.)

Defendant correctly points out that Plaintiff points to no specific New Jersey Constitutional provision, legislation, administrative rule, or judicial decision to support her *Pierce* claim and

instead relies generally on "the New Jersey Constitution and Public Policy."  Case law is clear, however, that "the employee must point to a clear expression of public policy, however, neither the New Jersey Constitution nor [any other general body of law] can be the source of public policy to support Plaintiff's *Pierce* claim." *Triola v. Afscme N.J. Council 63*, Civ. No. 20-886, 2020 WL 7334314, at *3 (D.N.J. Dec. 11, 2020).

Even considering all facts and their logical inferences in the light most favorable to Plaintiff, it appears any viable *Pierce* doctrine claim that Plaintiff may pursue would be preempted by Plaintiff's other claims.  "When the sources of public policy [upon which a defendant relies] are coterminous with his statutory claims, he cannot advance a separate common law public policy claim." *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 73 (3d Cir. 1996) (citing *Catalane v. Gilian Instrument Corp.*, 638 A.2d 1341, 1349 (N.J. Super. Ct. App. Div. 1994)). Plaintiff's claim under the *Pierce* doctrine is preempted because the sources of public policy supporting it are coterminous with her NJLAD, Title VII, or Section 1981 claims.  *Id.* Accordingly, Defendant's Motion for Summary Judgment against Plaintiff's *Pierce* doctrine claim in Count Seven will be granted.

## F.    RETALIATION

Counts Two, Four, and Six allege retaliation in violation of Section 1981, Title VII, and NJLAD respectively.  The *McDonnell Douglas* burden-shifting framework applies to retaliation cases under all of these anti-discrimination statutes.  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001).  To establish a prima facie case of retaliation, Plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) her employer took adverse employment action against her after or contemporaneously with her

protected activity; and (3) there was a causal connection between her protected activity and the adverse employment action. *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

Defendant argues Plaintiff has not established a prima facie case of retaliation because she did not suffer an adverse employment action. (Moving Br. at 17.) Moreover, Plaintiff failed to show that the derogatory names she was called were in response to the complaints that she was submitting. (*Id.* at 18.) Lastly, Plaintiff "did not prove that [Defendant]'s alleged retaliation was the but-for cause of her injury as [Defendant] did not terminate or change Plaintiff's employment conditions as she voluntarily stopped reporting to work. (*Id.* at 20.)

Plaintiff counters that she engaged in protected activity every time she made complaints to the managers about the discrimination she faced at work. (Opp'n at 24.) Her employer took adverse employment action against her after making the complaints by changing her work shift and denying her request to leave work on time. (*Id.*) "The causal connection between her complaints and the adverse employment action are established because [Plaintiff] did not have her hours changed or have requests for leave denied or get told to turn in her uniform thereby terminating her employment until after she made repeated complaints about the race and gender discrimination." (*Id.*)

It is undisputed that Plaintiff engaged in protected activity by filing complaints of racial discrimination to her managers. (SMF ¶¶ 2–13; CSMF ¶¶ 2–13.) Plaintiff fails, however, to establish that her employer took adverse employment action against her after or contemporaneously with her protected activity. Retaliatory conduct rises to the level of a materially adverse action if the conduct alters the "employee's compensation, terms, conditions or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1301 (3d Cir.

1997).   Plaintiff points to three actions that she claims are materially adverse: "changing [Plaintiff]'s schedule in response to her complaints of race and gender discrimination and denying her [request to] leave" work on time (Opp'n at 24) and understaffing during the nighttime shift (*id.* at 15).   While it is undisputed that Defendant changed Plaintiff's work shift to different hours, this conduct alone does not rise to the level of a material adverse action.   An adverse employment action requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ford v. Cty. of Hudson*, 729 F. App'x 188, 195 (3d Cir. 2018) (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999)).   Although the parties admit to Plaintiff's shift change, Plaintiff does not argue—or even attempt to argue—that the shift change included a salary decrease, different responsibilities, or a change in benefits.   In fact, the parties agree that Plaintiff actually received a pay raise.   (SMF ¶ 45; CSMF ¶45.)

The Court acknowledges that "assigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions." *Mondzelewski v. Pathmark Stores, Inc*., 162 F.3d 778, 788 (3d Cir. 1998).   However, in examining the issue of a shift change as an employment action, the Third Circuit Court of Appeals has found that changing an employee from early/late shift work to a fixed, normal workday schedule could constitute an adverse employment action if it constituted a change in the "terms, conditions, or privileges of employment."[1] *Id*. at 788.   No such change in status or disruption occurred here.   "Having to work an undesirable shift is not an adverse employment action." *Sivells v. Sam's Club*, Civ. No. 14-7650, 2017 WL 3151246, at *6 (D.N.J. July 25, 2017); *see also Clayton v. Pa Dep't of Welfare*,

---

[1] *See e.g. Connolly v. Mitsui O.S.K. Lines (Am.) Inc.,* Civ. No. 04-5127, 2009 WL 3055378 (D.N.J. Sep. 21, 2009) (finding that the plaintiff met her burden at summary judgment in asserting that she suffered an adverse employment action because it was undisputed that her change in work shift negatively affected her commute); *Florence v. Runyon*, 990 F. Supp. 485, 498 (N.D. Tex.1997) (same).

304 F. App'x 104, 106-7 (3d Cir. 2008) (affirming district court's grant of summary judgment for failure to establish an adverse employment action where plaintiff alleged that he was forced to work an inconvenient schedule). "Neither is understaffing, or leaving an employee alone for all or part of a shift." *Sivells*, 2017 WL 3151246, at *6 (citing *Pagan v. Holder*, 741 F. Supp. 2d 687, 692, 696-97 (D.N.J. 2010) (ruling that working alone in a gymnasium filled with over one hundred federal prisoners is not an adverse employment action)). These incidents, although Plaintiff quite understandably was upset by them, are not adverse employment actions. They are instead garden-variety workplace complaints. Considered individually or collectively, Plaintiff's grievances do not rise to the level of an adverse employment action actionable under the anti-discrimination statutes. *See also Goodall-Gaillard v. N.J. Dep't of Corr.*, Civ. No. 09-954, 2014 WL 2872086, at *38, n.40 (D.N.J. June 24, 2014) (finding allegations that plaintiff was "denied assistance," given "worse assignments," and "a worse work schedule" insufficient to establish discriminatory action), *aff'd*, 625 F. App'x 123, 128 (2015), *cert. denied* 136 S. Ct. 1207 (2016).

Plaintiff also argues and asserts that Defendant denied her request to leave work on time and required her to stay late to do extra cleaning on one occasion. (Opp'n at 15); (Pl. Dep., Def. Ex. F, 43:13-44:14.) To support this assertion, however, Plaintiff relies on her own self-serving deposition testimony. Under the circumstances, Plaintiff's self-serving statements during her deposition are not sufficient to defeat summary judgment. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("conclusory, self-serving [statements] are insufficient to withstand a motion for summary judgment.") Thus, absent any other evidence to support her allegation that Defendant required her to stay past her shift to do extra work, Plaintiff's testimony will not withstand Defendant's motion for summary judgment. Accordingly, because Plaintiff was

unable to establish an adverse employment action, the Court will grant Defendant's Motion for Summary Judgment on Counts Two, Four, and Six.

### G.     HOSTILE WORK ENVIRONMENT

Counts Eight, Nine, and Ten allege hostile work environment in violation of Section 1981, Title VII, and NJLAD respectively.  To establish a prima facie case of hostile work environment under all three of the anti-discrimination statutes, a plaintiff must show that "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability [meaning the employer is responsible]." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (alterations in original) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

The Third Circuit has clarified that harassing conduct under § 1981 may be either severe or pervasive to qualify under the second prong, and that even a single instance of harassment can suffice to state a claim.  *Castleberry*, 863 F.3d at 263–4.  This test conforms to the standard for establishing workplace racial or gender harassment under federal Title VII law.  *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986).

In choosing its test for a corresponding claim under NJLAD, the New Jersey Supreme Court has likewise rejected a conjunctive regular-and-pervasive test that requires repetitive or recurrent acts to establish workplace harassment; harassment-discrimination actions based on a single, extremely severe incident are therefore permitted.  *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 606 (1993); *Taylor v. Metzger*, 152 N.J. 490, 498-99 (1998).   However, "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile

work environment claim" under either Title VII or the NJLAD. *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The same is true for an equivalent claim under § 1981. *Hajra v. Wawa, Inc.*, Civ. No. 15-7513, 2018 WL 565574, at *10 (D.N.J. Jan. 26, 2018) (applying same standard to claim under § 1981 on motion for summary judgment); *Wise v. Estes*, Civ. No. 10-481, 2010 WL 2757273, at *5–6 (D.N.J. July 6, 2010) (on motion to dismiss). "Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Id.* A court must examine "the totality of the circumstances and factors such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 653 (E.D. Pa. 2012) (regarding claims under Title VII and § 1981), *aff'd*, 565 F. App'x 88 (3d Cir. 2014) (quoting *Faragher*, 524 U.S. at 788).

In this case, Defendant argues that Plaintiff fails to establish her hostile work environment claims because she did not show how Defendant's conduct was severe enough to create a hostile work environment. (Moving Br. at 22.) For example, "[t]he instances when Tommasi and Cruser called her a bitch were offhand comments and isolated." (*Id.* at 23.) Although Defendant concedes that Plaintiff was called "nigger" (SMF ¶ 17), it remains conspicuously silent in its Motion for Summary Judgment on whether or not that racial epithet may constitute a hostile work environment. Plaintiff counters that she "was routinely and repeatedly called the N-word and 'monkey'" and that this was a continuous occurrence at work. In her view, her treatment therefore meets the pervasive requirement. Alternatively, she insists the egregiousness of the language also meets the severe standard." (Opp'n at 21.) Under the NJLAD, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Heitzman v. Monmouth Cty.*,

321 N.J. Super. 133, 147 (App. Div. 1999) (quoting *Faragher*, 524 U.S. at 788), *overruled on other grounds*, *Cutler v. Dorn*, 196 N.J. 419 (2008).  Therefore, harassing conduct must be severe or pervasive.  *Lehmann*, 132 N.J. at 606 ("The disjunctive 'severe or pervasive' standard is in conformity with federal Title VII law.").  Such conduct may be distinguishable from the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee." *Meritor*, 477 U.S. at 67.  The Court in *Faragher* reiterated that Title VII's standards, "[p]roperly applied, . . . will filter out complaints 'attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing[,]'" and cited with approval a collection of cases "instructing that '[d]iscourtesy or rudeness should not be confused with racial harassment' and that 'a lack of racial sensitivity does not, alone, amount to actionable harassment.'"  *Id*. at 788 (internal citations omitted).  Accordingly, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not sufficient.  *Faragher*, 524 U.S. at 788 (internal citation omitted).

Per *Faragher*, "the question presented to this Court is whether the Court ought to rule that any potential finding by a factfinder, taking into account all the circumstances, that the incident[s] with [Plaintiff's co-workers] ought to be categorized as "extremely serious" (and therefore 'severe' under NJLAD) would be unreasonable, as a matter of law."  *Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535, 547 (D.N.J. 2018).

The *Nuness* court declined "to limit the scope of how a reasonable finder of fact—notably, not this Court at summary judgment—may interpret and weigh" a single incident of Plaintiff being called "niglet".  *Id.* at 547.  The *Nuness* court further quoted then-Judge Kavanaugh in *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013), in noting that "several courts have recognized, moreover, [that] a single verbal (or visual) incident can likewise be sufficiently severe to justify a

finding of a hostile work environment. . . . It may be difficult to fully catalogue the various verbal insults and epithets that by themselves could create a hostile work environment." Here, Plaintiff was called "nigger" and "bitch" on several occasions during her tenure at McDonald's. "The Court expresses its sincere hope that little need be said to establish the objective offensiveness, and the severity of that offense, of the word 'nigger.'" *Nuness*, 325 F. Supp. 3d at 547. The Court notes that Plaintiff's co-worker's comments to Plaintiff did not arise in a way that was perceived by Plaintiff as jocular or collegial, and the Court is unwilling to say that her perception was unreasonable as a matter of law. (Pl. Dep. 103:5-104:14.) "A reasonable factfinder would be readily capable of concluding that this was far from the simple teasing or "isolated incident" not actionable under Title VII, as discussed in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) and *Faragher. Id.* at 549. Defendant argues that these remarks were isolated incidents but does not dispute that they were offensive. Regardless, the severity of Plaintiff's coworker's remarks will be a question for the finder of fact to resolve at trial, and not for the Court on summary judgment. *Id.*

With respect to respondeat superior liability, "the basis of an employer's liability for a hostile work environment claim depends on whether the harasser is the victim's supervisor or coworker." *Mandel*, 706 F.3d at 169 (citing *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)). "[A]n employer is vicariously liable to a victimized employee 'for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Hitchens v. Montgomery Cty.*, 278 F. App'x 233, 235-36 (3d Cir. 2008) (quoting *Faragher*, 524 U.S. at 807). In this scenario, "a supervisor must take tangible employment action against the subordinate." *Baker v. Boeing Helicopters*, Civ. No. 01-3565, 2004 WL 1490358, at *4 (E.D. Pa. June 30, 2004). "[I]f the person charged with creating

the hostile environment is the plaintiff's co-worker, and not a supervisor, 'liability exists [only] where the [employer] knew or should have known of the harassment and failed to take prompt remedial action.'" *Hitchens*, 278 F. App'x at 236 (quoting *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999)).

It is undisputed that co-workers and members of management—such as assistant manager Cruser—referred to Plaintiff as "bitch" while working. (SMF ¶ 17; Cortes Dep., Def. Ex. H, 98:13-99:4; Pl. Dep. 34:20-35:2.)  It is further undisputed that management, on at least one occasion, ignored Plaintiff's complaint that she was called "nigger".  (Orzuna Dep., Pl. Ex. I, 162:10-14; 175:8-12).  "An employer can also be found liable if it was aware or should have been aware of the harassment and failed to take prompt remedial action. By failing to take such action, the employer contributes to the hostile work environment and may therefore be found liable."

Plaintiff has presented sufficient evidence that management level employees were aware of her complaints of racial harassment but they failed to take prompt remedial action.  Plaintiff has therefore established a prima facie case of hostile work environment.  Accordingly, the Court will deny Defendant's Motion for Summary Judgment with respect to Plaintiff's hostile work environment claims in Counts Eight, Nine, and Ten.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, the Court will GRANT Defendant's Motion for Summary Judgment with respect to Plaintiff's retaliation claims in Counts Two, Four, and Six, and *Pierce* doctrine claim in Count Seven of the Fourth Amended Complaint.  The Court will DENY

Defendant's Motion for Summary Judgment with respect to the remaining claims in the Fourth Amended Complaint.  An appropriate Order will follow.

Date: **May 23, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**